**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KEVIN B. NELSON,** | : **Civil Action No.:** 3:15-CV-64 |
| **Plaintiff,** | : (Filed: March 11, 2015) |
| | : |
| **v.** | : **District Judge:** |
| | : |
| **CHRIS W. BENDER;** | : **CIVIL ACTION – LAW** |
| **CHRISTOPHER B. COHN;** | : |
| **THOMAS J. QUINN;** | : |
| **JAMES M. BRADY;** | : |
| **LOGAN TOWNSHIP, PENNSYLVANIA;** | : **JURY TRIAL DEMANDED** |
| and **THE PENNSYLVANIA STATE** | : |
| **UNIVERSITY;** | : |
| **Defendants.** | : |

## COMPLAINT

**AND NOW** comes the Plaintiff, Kevin B. Nelson, by and through his undersigned counsel, Devon M. Jacob, Esquire, of the law firm of Jacob Litigation, A Civil Rights Law Firm, and avers the following:

### Introduction

1.      In April of 2013, Kevin Nelson was an honor student, enrolled in the College of Engineering at The Pennsylvania State University ("PSU") Altoona Campus.

2.      Kevin had recently attended a meeting of the Alpha Lambda Delta Freshman Honor's Society, having made the Dean's List with engineering level courses.

3.      Kevin was on course to one day graduate from the College of Engineering, destined and excited to enjoy the benefits that one would expect to derive from such an achievement.

1

4.      Before the month's end, however, Kevin's honor-level educational plans and aspirations would be derailed by the unlawful actions of a rogue police officer.

5.      PSU Altoona is located in Logan Township, Pennsylvania.

6.      Logan Township, owns and operates the Logan Township Police Department ("LTPD").

7.      The LTPD was not, and is not, an accredited law enforcement agency.

8.      On April 6, 2013, Chris W. Bender, a police officer employed by LTPD, who was not adequately trained in the Commonwealth and Federal laws, and who was not properly trained in standard police practices and techniques, physically attacked Kevin.

9.      The unprovoked attack occurred on the ground level rear porch to Kevin's residence, which was located in the Nittany Pointe apartment complex.

10.      Earlier that day, also in the Nittany Pointe apartment complex, there had been an outdoor fraternity sponsored party that the Township and apartment complex owners permitted to take place annually – "Toon Fest" – where minors would consume alcoholic beverages, and at times, become disorderly.

11.      Kevin did not attend the party that had since dispersed, had not consumed any alcoholic beverages, and did not participate in a minor public disorder that had apparently occurred during the party (a bottle throwing incident).

12.      Regardless, an agitated Officer Bender confronted Kevin, who was peacefully sitting on his porch playing his guitar and minding his own business, and directed him to go inside of his residence.

2

13.     When Kevin inquired as to the reason why he needed to go inside, the already stressed Officer Bender snapped, and launched his unprovoked attack – choking Kevin, bending his right arm backward over a metal railing, hyperextending his right wrist, and tasering him.

14.     Despite having a legal duty and an appreciable opportunity to intervene to protect Kevin from Officer Bender's unlawful conduct, three PSU Altoona police officers, Christopher B. Cohn, Thomas J. Quinn, and James M. Brady, instead prevented bystanders from intervening on Kevin's behalf, assisted Officer Bender in attacking Kevin, and/or stood by and watched the attack occur.

15.     Unbeknownst to Officers Bender, Cohn, Quinn, and Brady, their actions (and inactions) were captured on video.

16.     This video vindicated Kevin and eventually led to the voluntary dismissal of frivolous criminal charges that had been filed by Officer Bender, and an offer of ARD on the remaining criminal charges.

17.     Despite Officer Bender's obvious unlawful conduct, Logan Township did not discipline or retrain him, and the district attorney did not criminally prosecute him.

18.     Likewise, despite Officers Cohn's, Quinn's, and Brady's unlawful conduct, PSU did not discipline or retrain them, and the district attorney did not criminally prosecute them.

19.     For this reason, Kevin is prosecuting this civil rights action – to have a federal court do what Logan Township and PSU policymakers should have done – declare the Defendant Officers' conduct to be unlawful.

### Jurisdiction and Venue

20.     This action is brought pursuant to 42 U.S.C. § 1983.

3

21.     Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343 & 1367.

22.     Venue is proper in this Court, as the cause of action arose in the Western District of Pennsylvania.

**Parties**

23.     Plaintiff, Kevin B. Nelson, is an adult, who, currently resides in the State of Connecticut.

24.     Defendant, Chris W. Bender, is an adult individual, who, during all relevant times, was employed by the LTPD, as a police officer.   All of Defendant Bender's actions or inactions were taken under color of state law. He is sued in his individual capacity.

25.     Defendant, Christopher B. Cohn, is an adult individual, who, during all relevant times, was employed by the PSU Altoona Police Department, as a police officer, with the rank of Sergeant. All of Defendant Cohn's actions or inactions were taken under color of state law. He is sued in his individual capacity.

26.     Defendant, Thomas J. Quinn, is an adult individual, who, during all relevant times, was employed by the PSU Altoona Police Department, as a police officer. All of Defendant Quinn's actions or inactions were taken under color of state law. He is sued in his individual capacity.

27.     Defendant, James M. Brady, is an adult individual, who, during all relevant times, was employed by the PSU Altoona Police Department, as a police officer. All of Defendant Brady's actions or inactions were taken under color of state law. He is sued in his individual capacity.

4

28.     Defendant, Logan Township, Pennsylvania (hereinafter "Township"), is located at 100 Chief Logan Circle, Altoona, PA 16602. The Township is the second largest political subdivision in Blair County, Pennsylvania. The Township owns and operates the LTPD. During all relevant times, Defendant Bender acted pursuant to the policies, practices, and customs adopted and/or ratified by the Defendant Township.

29.     The Pennsylvania State University ("PSU") is a state-related institution of higher education created in 1855 by an act of the Pennsylvania General Assembly. See 24 P.S. §2531. PSU's status as an instrumentality of the Commonwealth has long been recognized by all branches of the Commonwealth and Federal governments. PSU owns and operates the PSU Altoona Campus, and the University Police Department, that provides police services to the Altoona campus. During all relevant times, Defendants Cohn, Quinn, and Brady, acted pursuant to the policies, practices, and customs adopted and/or ratified by Defendant PSU.

## The Rules

30.     **Rule 1:** "[Y]elling at police, especially in the privacy of one's own home, does not constitute a crime." See Veiga v. McGee, 26 F.3d 1206, 1214 (1st Cir. 1994).

31.     **Rule 2:** A police officer may only use the amount of force which is necessary to accomplish an arrest. See 18 Pa.C.S. § 508(a)(1).

32.     **Rule 3:** An officer is liable for excessive force if his or her own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force[.]"); Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir. 1997); Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995); Estate of Starks v. Enyart, 5 F.3d 230, 233-34 (7th Cir.1993); Catlin v. City of

5

<u>Wheaton</u>, 574 F.3d 361, 369 n.7 (7th Cir. 2009); <u>Sledd v. Lindsay</u>, 102 F.3d 282, 287-88 (7th Cir. 1996); <u>Alexander v. City and County of San Francisco</u>, 29 F.3d 1355, 1366 (9th Cir. 1994).

33.     **Rule 4:** A police officer has a duty to take reasonable steps to protect a victim from another officer's excessive force. <u>Smith v. Mensinger</u>, 293 F.3d 641, 650 (3d Cir. 2002).

34.     **Rule 5:** If an officer is present when his officer/colleague violates a citizen's constitutional rights, the officer is liable under Section 1983, if he had reason to believe that his colleague was committing a constitutional violation, and he had a reasonable and realistic opportunity to intervene but failed to do so. <u>See</u> <u>Sullivan v. Warminster Twp.</u>, 765 F.Supp.2d 687, 701 (E.D. Pa. 2011); <u>Bryant v. City of Phila.</u>, 2012 WL 258399, *8 (E.D. Pa. Jan. 27, 2012) (Robreno, J.).

## <u>Background</u>

35.     Nittany Pointe, is a privately owned apartment complex located at 200 Campus View Drive, Altoona, PA 16601.

36.     In April of 2013, tension had developed between the residents of Nittany Pointe and police officers of the LTPD, to the point where a lieutenant with the LTPD commented that "Our guys don't even want to go up there."

37.     On April 6, 2013, the annual "Toon Fest" took place on the grounds of Nittany Pointe.

38.     "Toon Fest" is an outdoor fraternity party that the Defendant Township and apartment complex owners permit to take place annually, where minors are known to consume alcoholic beverages, and at times, become disorderly.

6

39.     LTPD Police Chief, Ron Heller, stated that the Defendant Township has an open container ordinance, and on the date in question, officers "went on scene and sat and observed."

40.     While the outdoor party was occurring, and officers were lying in wait to enforce the open container ordinance, Kevin Nelson was at his home, located at 2011 Campus View Drive, sitting on his ground level rear porch, visiting with several of his friends.

41.     Neither Kevin nor his friends had attended or were associated with the outdoor party.

42.     According to Defendant Bender, at some point in time, persons at the outdoor party became disorderly, and Defendant Bender declared that a riot situation existed.[1]

43.     Defendant Bender summoned police officers from neighboring jurisdictions to Nittany Pointe, and directed the crowd to disperse, which it did.

44.     At around 4:20 P.M., an agitated Defendant Bender approached Kevin's porch, with his hand on the butt of his holstered gun, using profanity, and directed Kevin and his guests to go inside of Kevin's residence.

45.     After Kevin's guests went inside, Kevin asked Defendant Bender if a dangerous condition existed.

---

[1] Subsequently, it was discovered that Defendant Bender grossly exaggerated the situation. Officer Bender claimed that the "riot" involved a crowd of 800-1,000 people. Other officers who responded to the scene, however, placed the numbers in the range of 150-300, with video evidence placing the number of people in the range of 100. The "riot" consisted of a few bottles being thrown in the vicinity of Defendant Bender who was apparently waiting for an opportunity to enforce the Township's open container ordinance. In an attempt to justify the filing of felony level aggravated assault charges, Officer Bender stated in his affidavit of probable cause, "Officer Bender started to have pain in his right elbow area. The pain in the right elbow was worsening throughout the evening."

46.     In response, Defendant Bender called Kevin an "idiot."

47.     Still unclear as to the reason for the direction to go inside, Kevin again inquired if a dangerous condition existed.

48.     Defendant Bender again called Kevin an "idiot," stated that a riot situation existed (despite the fact that it obviously did not), and that if he did not go inside, he would be arrested for disorderly conduct and riot.

49.     Having not been associated with the party or any prior disorder, and being on his own porch engaged solely in lawful conduct, Kevin asked Defendant Bender if there was a law that permitted him to require him to leave his porch.

50.     Instead of simply explaining to Kevin his then understanding of the law, the already stressed Defendant Bender snapped, and physically attacked Kevin, grabbing Kevin by the neck and choking him.

51.     Importantly, prior to being attacked by Defendant Bender, Kevin had merely asked Defendant Bender a question, had not stated that he would not go inside as directed, had not been told that he was under arrest, had not been requested to physically submit himself to custody, was not armed, and had not verbally or physically threatened Defendant Bender.

52.     When Defendant Bender choked Kevin, Kevin was not able to breathe freely, turned visibly red, and became scared for his physical safety and wellbeing.

53.     While the attack was occurring, despite having a legal duty and an appreciable opportunity to intervene to protect Kevin from Officer Bender, Defendant Officers Christopher B. Cohn, Thomas J. Quinn, and James M. Brady, instead prevented bystanders from intervening

on Kevin's behalf, assisted Officer Bender in attacking Kevin, and/or stood by and watched the attack occur.

54.     In the presence of Defendants Cohn, Quinn, and Brady, Defendant Bender proceeded to bend Kevin's arm backward over a metal porch railing and hyperextend Kevin's wrist causing him to suffer incredible pain.

55.     Again, instead of intervening to protect Kevin from being tortured by Defendant Bender, Defendants Cohn, Quinn, and Brady, either physically restrained Kevin, or stood by and watched the attack take place.

56.     Throughout the attack, Kevin can be heard screaming in agony, pleading with officers to stop because he had not done anything wrong.

57.     Similarly, bystanders can be heard pleading with the officers to stop hurting Kevin.

58.     The force used by Defendant Bender made complying with Defendant Bender's instruction to "stand up," impossible.

59.     As soon as it was possible to stand, however, Kevin did so, and again asked why he was being attacked.

60.     In response, Defendant Bender yanked hard on Kevin's arm, in an attempt to drag him over the metal porch railing, and threatened to taser[2] Kevin.

---

[2] While police officers often refer to all electronic control weapons ("ECWs") as TASERs, in actuality, TASERs are one brand of ECW that is produced only by TASER International, Incorporated. At the time, Defendant Bender possessed a Karbon Arms MPID brand ECW, not a TASER.

61.     Instead of intervening and simply walking Kevin out of his front door, Defendants Cohn and Quinn assisted Defendant Bender in forcing Kevin over the porch railing, while Defendant Brady stood by and watched.

62.     Once in the yard, Defendant Bender fired probes from his Karbon Arms MPID ECW into Kevin's back, delivering an electronic charge into Kevin's body, which largely incapacitated Kevin.

63.     Just prior to handcuffing Kevin behind his back, Defendant Bender shoved his Karbon Arms MPID into Kevin's chest and threatened to taser him again.

64.     Any properly trained police officer knows that the deployment of an ECW into the chest of a person is an absolute last resort, as doing so could cause cardiac arrest.

65.     Unbeknownst to the Individual Defendants, a bystander videotaped the attack.

66.     The video of the attack is attached at **Exhibit A**.

67.     After the attack, Defendant Bender stated that Kevin was arrested because "It was a riot situation. He failed to disperse and resisted arrest."

68.     In an attempt to justify the unprovoked attack, Defendant Bender falsely criminally charged Kevin with the following: Aggravated Assault on a Police Officer (F2); Riot (F3); Resisting Arrest (M2); Failure of Disorderly Persons to Disperse (M2); Recklessly Endangering Another Person (M2); and Disorderly Conduct (M3).

69.     In the sworn Affidavit of Probable Cause filed in support of the criminal charges, Defendant Bender stated in relevant part, the following:

> The Defendant was sitting in a chair with a guitar on his lap and would not comply. He was being verbally defiant and using profane language. Officer Bender ordered the Defendant to go inside or be arrested. He would not comply after several

demands and Officer Bender told him he was under arrest and reached over the balcony and grabbed him around the neck to gain control of him until backup Officers could arrive and assist. The Defendants neck area was the only area of the body that he could reach. The Defendant immediately resisted, threw his guitar on the floor and attempted to drop his body to the floor off of the chair. Officer Bender maintained his arm around the Defendants neck and held him in place.

Sgt Kohn of Altoona Campus Police arrived and reached over the railing and grabbed the Defendant by the left arm. Officer Bender grabbed the Defendant by the right arm and they attempted and ordered him several times to stand up and climb over the railing. The Defendant would not comply and continued to throw all his weight, 6'2"" tall and 205 pounds, to the ground. Officer Bender applied compliance control to the Defendants right hand and wrist with little success. Officer Bender gradually applied more pressure to the Defendants right wrist until he stood up. At that point when he was standing the Defendant continued to resist and Officer Quinn of Altoona Campus Police climbed over the railing to assist with the Defendant.

The three Officers attempted several times to get the Defendant up and over the railing with no success.  Officer Bender then removed his Karbon Arms MPID from his holster and pointed it at the Defendant and told him several times to comply or he would be tased. The Defendant finally threw his left leg up onto the railing and the Officers assisted him over the railing. The three Officers attempted to place the Defendants hands behind his back and place him into handcuffs. The Defendant started to resist with more force and Officer Bender was telling him to comply or he would be tased. Officer Bender ordered the approximately three more times. The Defendant then swung his upper body toward Officer Bender in an aggressive manner and they were then face to face. At that point Officer Bender had the Karbon Arms MPID In his left hand and discharged the Karbon Arms MPID and the probes went into the middle of his back.

The Defendant fell to the ground and landed on his back. He was yelling OK and Officers were yelling at him to roll over onto his front. When the Karbon Arms MPID cycled he would not comply and roll over onto his front and Officers had to push him over to his front. Officers again attempted to place the Defendant into handcuffs and the Defendant resisted. The Officers had to use physical force to control the Defendants arms and place him into handcuffs. The Officers stood the Defendant up and the Defendant would not walk to the cruiser on his own and continued to face toward Officers and was being verbally combative.

70.     The video of the attack, **Exhibit A**, contradicts Defendant Bender's sworn statement.

71.     Kevin was arraigned on the criminal charges, and when he could not immediately post bail, was incarcerated, where he was subjected to a strip search.

72.     Upon seeing the video attached at **Exhibit A**, the Blair County District Attorney voluntarily dismissed the following charges: Aggravated Assault on a Police Officer (F2); Riot (F3); Resisting Arrest (M2), and offered to dispose of the remaining criminal charges through the Accelerated Rehabilitative Disposition ("ARD") program.[3]

73.     To avoid the significant cost of a criminal defense, quickly resolve the matter, and have an opportunity to have the frivolous criminal charges expunged from his record, Kevin agreed to participate in the ARD program.

74.     Kevin has since successfully completed the ARD program, and his criminal record has been expunged.[4]

75.     Despite the fact that Kevin's criminal record has been expunged, the incident will haunt Kevin indefinitely.

---

[3] The primary purpose of this program is the rehabilitation of the offender; secondarily, the purpose is the prompt disposition of charges, eliminating the need for costly and time-consuming trials or other court proceedings. The ARD program is generally available to first-time offenders who lend themselves to treatment and rehabilitation rather than punishment, and who have been charged with relatively minor crimes that do not involve a serious breach of the public trust.

[4] Unfortunately, despite the frivolity of the criminal charges, and the fact that successful completion of an ARD program terminates the prosecution, see PA.R.CRIM.P. 184, 185; Commonwealth v. Briley, 420 A.2d 582 (Pa. 1980), an ARD termination is a court-supervised compromise, Commonwealth v. Kindness, 371 A.2d 1346 (Pa. 1977), and therefore, as a matter of law, bars the filing of a malicious prosecution claim against the accuser. See Davis v. Chubb/Pacific Indemnity Group, 493 F.Supp. 89 (E.D.Pa.1980); Restatement (Second) of Torts, § 660(a).

76.     The fact remains that the media accounts of the incident will reside forever on the Internet, and to vindicate his civil rights, Kevin must prosecute his claims in a public court of record.

77.     As a result of the attack, Kevin suffered physical and emotional injury, and damage to his reputation; was unjustly disciplined by and suspended from Defendant PSU; was forced to withdraw from Penn State to escape the embarrassment associated with being regularly referred to as "the kid who got tased"; lost a significant amount of educational time; and has been forced to pursue alternative educational and career options.

## COUNT I

**Plaintiff v. Individual Defendants**
**Fourth Amendment (Excessive Force) Pursuant to 42 U.S.C. § 1983**

78.     Paragraphs 1-77 are stated herein by reference.

79.     Claims that police officers used excessive force in an arrest are analyzed under the Fourth Amendment objective reasonableness standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).

80.     To state a claim for excessive force under the Fourth Amendment, a Plaintiff must show that a seizure occurred and that it was unreasonable. See Curley v. Klem, 499 F.3d 199, 203 (3d Cir. 2007).

81.     "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment[.]" Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006) (citing Graham v. Connor, 490 U.S. 386, 395 (1989); Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004)).

82.     The test of Fourth Amendment reasonableness of force used during a seizure is

13

whether, under the totality of the circumstances, an officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivations. See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397.

83.     "In deciding whether challenged conduct constitutes excessive force, a court must determine the objective 'reasonableness' of the challenged conduct, considering 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Couden, 446 F.3d at 496-97 (quoting Carswell, 381 F.3d at 240).

84.     "Other factors include 'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" Couden, 446 F.3d at 497 (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)).

85.     In addition, an officer is liable for excessive force if his or her own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force[.]"); Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir. 1997); Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995); Estate of Starks v. Enyart, 5 F.3d 230, 233-34 (7th Cir.1993); Catlin v. City of Wheaton, 574 F.3d 361, 369 n.7 (7th Cir. 2009); Sledd v. Lindsay, 102 F.3d 282, 287-88 (7th Cir. 1996); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1366 (9th Cir. 1994).

86.     Finally, a police officer has a duty to take reasonable steps to protect a victim from another officer's excessive force. Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).

87.     If an officer is present when his officer/colleague violates a citizen's constitutional rights, the officer is liable under Section 1983, if he had reason to believe that his colleague was

14

committing a constitutional violation, and he had a reasonable and realistic opportunity to intervene but failed to do so. See Sullivan v. Warminster Twp., 765 F.Supp.2d 687, 701 (E.D. Pa. 2011); Bryant v. City of Phila., 2012 WL 258399, *8 (E.D. Pa. Jan. 27, 2012) (Robreno, J.).

88.     Defendant Bender used force to effect an unlawful arrest.

89.     Therefore, *any/all* force used by Defendant Bender against Kevin was unreasonable, and therefore, unlawful.

90.     In the alternative, Defendant Bender's reckless or deliberate conduct unreasonably created the need for Defendant Bender to use the level of force that he used.

91.     Therefore, the force used by Defendant Bender against Kevin was unreasonable, and therefore, unlawful.

92.     In the further alternative, if it is determined that Defendant Bender enjoyed a privilege to use force against Kevin, the force used was excessive and unreasonable, and therefore, unlawful.

93.     Finally, Defendants Cohn, Quinn, and Brady had a legal duty and an appreciable opportunity to intervene to protect Kevin from Defendant Bender's unlawful actions but failed to do so.

94.     Instead, they either participated in the unlawful use of force, or stood by and watched while the unlawful use of force occurred.

95.     Therefore, Defendants Cohn's, Quinn's, and Brady's conduct was unlawful.

15

## COUNT II

**Plaintiff v. Defendants Township and PSU**
**Fourth & Fourteenth Amendments (Municipal Liability)**
**Pursuant to 42 U.S.C. § 1983**

96.     Paragraphs 1-95 are stated herein by reference.

97.     A municipality may be held liable if its policies, practices, and/or customs are the moving force behind the deprivation of an individual's constitutional rights. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978).

98.     Moreover, a municipality's failure to properly train its employees and officers can amount to a "custom" that will trigger liability under section 1983. See City of Canton v. Harris, 489 U.S. 378, 388 (1989).

99.     Deliberate indifference to a training need may be established when a policymaker has knowledge of a "pattern of similar constitutional violations by untrained employees" but takes no action to augment or alter the municipality's employee training programs accordingly. See Lapella v. City of Atl. City, No. 10-2454, 2012 WL 2952411 at *7 (D.N.J. July 18, 2012) (citing Connick v. Thompson, 131 S.Ct. 1350, 1360 (2011)); Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990).

100.     The Defendant Township owns and operates the Logan Township Police Department.

101.     The Logan Township Police Department was formed in April of 1966.

102.     The Department employs 16 fulltime police officers who provide protection and services 24 hours a day.

103.    The coverage area is approximately 52 square miles, which includes residential, business, industrial, and agricultural areas.

104.    LTPD officers respond to an average of 9,000 calls for service per year.

105.    During all relevant times, Defendant Bender acted pursuant to the policies, practices, and customs adopted and/or ratified by the Defendant Township.

106.    Defendant PSU is a public university with campuses and facilities throughout the Commonwealth of Pennsylvania.

107.    Defendant PSU has a student enrollment of approximately 95,000 people across 24 campuses.

108.    Defendant PSU owns and operates the University Police Services, which provides police services to the PSU Altoona Campus.

109.    Defendant PSU's University Police Services contingency stationed at the Altoona Campus, consists of a police chief, eight police officers (including Defendants Cohn, Quinn, and Brady), and auxiliary police.

110.    The police officers are Act 120 certified municipal police officers who are authorized to carry firearms and empowered to make arrests.

111.    During all relevant times, Defendants Cohn, Quinn, and Brady, acted pursuant to the policies, practices, and customs adopted and/or ratified by Defendant PSU.

112.    As such, policymakers of the Defendants Township and PSU were on notice that police officers employed by the Defendants Township and PSU would likely regularly be in situations where they would be taking people into custody with or without the need for the use of force.

17

113.    Therefore, said policymakers had a duty to enact proper policies to govern the police officers in their employ, and to properly train the police officers in their employ.

114.    The Defendants Township and PSU maintained policies, practices, and customs, which were the moving force that resulted in Kevin's constitutional and statutory rights being violated.

115.    Moreover, the Defendants Township and PSU were on notice of a need for further training related to the issues discussed herein but failed to provide the training, which resulted in Kevin's constitutional and statutory rights being violated.

116.    It is believed that discovery will reveal, and therefore averred, that the Defendants Township and PSU failed to implement a policy, enforce a policy, or train police officers on the Fourth Amendment to the U.S. Constitution and on 42 U.S.C. § 1983.

117.    It is believed that discovery will reveal, and therefore averred, that the Defendants Township and PSU failed to implement an effective process to ensure that policies and training of the Defendants Township and PSU are followed by its police officers.

118.    It is believed that discovery will reveal, and therefore averred, that when it has been determined that officers have violated the constitutional or statutory rights of persons, or used unlawful force against persons, or when police officers have been named in citizen complaints, or when the Defendants Township and PSU have settled civil lawsuits, the Defendants Township and PSU have not required police officers to receive corrective or additional training.

119.    It is believed that discovery will reveal, and therefore averred, that the Defendants Township and PSU did not follow their internal affairs policy and investigate, discipline, or retrain the Individual Defendants for the conduct discussed in this Complaint.

18

120.    If it is ultimately determined that an internal affairs investigation occurred, it is believed that discovery will reveal, and therefore averred, that the investigation was triggered as a result of the instant litigation (so as to be a defense to the litigation), as opposed to when the Defendants Township and PSU first learned of the incident discussed herein.

121.    Chiefs of police and law enforcement experts have developed law enforcement accreditation standards that set out the minimum level of professionalism that police departments should achieve.

122.    In Pennsylvania, it is generally accepted that these standards are set by The Pennsylvania Law Enforcement Accreditation Program ("PLEAC") and/or The Commission on Accreditation for Law Enforcement ("CALEA").

123.    The policymakers for Defendants Township and PSU, however, have knowingly failed to maintain policies, practices, and training that meets the minimum accreditation standards set by PLEAC, CALEA, and/or similar type accrediting organizations.

124.    Moreover, the failure of Defendants Township and PSU to maintain proper policies, practices, and training, directly caused Kevin to suffer his constitutional injuries:

 a.    The Defendant Township failed to implement and/or enforce a policy and training on the Fourth Amendment and Pennsylvania Crimes Code Title 18 that would have permitted Defendant Bender to understand that detaining and arresting Kevin was unlawful;

 b.    Defendant PSU failed to implement and/or enforce a policy and training on the Fourth Amendment and Pennsylvania Crimes Code Title 18 that would have

permitted Defendants Cohn, Quinn, and Brady, to understand that Defendant Bender's detention and arrest of Kevin was unlawful;

c.   The Defendant Township failed to implement and/or enforce a policy and training on the Fourth Amendment and the use of force that would have permitted Defendant Bender to understand that the force that he used against Kevin was excessive and unreasonable, and therefore, unlawful.

d.   Defendant PSU failed to implement and/or enforce a policy and training on the Fourth Amendment and the use of force that would have permitted Defendants Cohn, Quinn, and Brady, to understand that the force used by Defendant Bender against Kevin was excessive and unreasonable, and therefore, unlawful, and that they had a legal duty to intervene to protect Kevin from Defendant Bender;

e.   The Defendants Township and PSU failed to implement and/or enforce a policy and training on the Fourth Amendment and the use of force that would have provided Defendants Bender, Cohn, Quinn, and Brady, with de-escalation techniques that would have prevented the need for the use of any force against Kevin.

f.   The Defendants Township and PSU annually permitted an outdoor fraternity party to occur at the Nittany Apartments knowing that minors consumed alcoholic beverages at the party, and that the party often resulted in public disturbances and then need for criminal arrests.

125.    Defendant Bender's actions in choking Kevin, bending Kevin's arm behind his back and over a metal porch railing, hyperextending Kevin's wrist, pulling Kevin over the porch railing, and using an Electronic Control Weapon on him, constitute official oppression and torture.

126.    The use of force techniques used by Defendant Bender did not comport with generally accepted force techniques taught in the municipal police academy, used in accredited law enforcement agencies, or permitted by law.

127.    Despite being provided with notice of Defendant Bender's unlawful actions, the filing of false criminal charges, and the video evidence that existed, the Defendant Township continued to criminally prosecute Kevin, and failed to discipline or retrain Defendant Bender.

128.    The Defendant Township's failures in this regard are post-event evidence proving the existence of the unlawful policies, practices, and customs that existed at the time of the incident and that caused Kevin's constitutional injuries.

129.    Moreover, the Defendant Township's continued prosecution of Kevin, and failure to discipline or retrain Defendant Bender, are ratification of his unlawful conduct.

130.    Likewise, despite receiving notice of Defendants Cohn's, Quinn's, and Brady's unlawful conduct through official police reports, and widespread media coverage of the incident, Defendant PSU failed to discipline or retrain Defendants Cohn, Quinn, and Brady.

131.    Defendant PSU's failures in this regard are post-event evidence proving the existence of the unlawful policies, practices, and customs that existed at the time of the incident and that caused Kevin's constitutional injuries.

132.    Moreover, the Defendant PSU's failure to discipline or retrain Defendants Cohn, Quinn, and Brady, is ratification of their unlawful conduct.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor as follows:

A.      That this Court declare that the Defendants' actions violated Kevin's constitutional and statutory rights;

B.      That the Court issue injunctive relief and direct Defendant PSU to purge its files of any electronic or hardcopy documents, disciplinary or otherwise, related to the underlying incident and subsequent criminal prosecution, and to enjoin Defendant PSU from commenting, releasing, or publishing, any related information.

C.      Compensatory damages;

D.      Punitive damages (except against the Defendant Township);

E.      Reasonable attorney's fees and costs; and

F.      Such other financial or equitable relief as is reasonable and just.

### Jury Trial Demand

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

_(signature)_
                                                                        **Date: March 11, 2015**

**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D.: PA 89182
Counsel for Plaintiffs

**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com

22